**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**GREAT FALLS DIVISION**

| | |
|---|---|
| JOSE DAVID CORTES TORRES,<br><br>Plaintiff,<br><br>v.<br><br>Jesse SLAUGHTER, Sheriff, Cascade County; et al.,<br><br>Defendants. | **CV-26-271-GF-BMM**<br><br>**ORDER** |

Petitioner Jose David Cortes Torres fled Mexico as a minor and entered the United States without inspection nearly three years ago. (Doc. 5 at 4.) Torres is now 20 years old and has been a resident of Bozeman, Montana since 2023. (Doc. 1 at 2, 7.) Torres previously attended high school in Bozeman, Montana. (*Id*. at 2) Torres is the primary caretaker for his grandmother who is undergoing chemotherapy for cancer. (*Id*.) Immigration and Customs Enforcement ("ICE") agents arrested Torres one day before Torres's grandmother was due to have her second chemotherapy treatment. (*Id*. at 15.)

Torres has lived in the United States for nearly three years. (*Id*.) No indications exist that Torres has had any documented encounters with law enforcement during his time in the United States. (*See generally* Doc. 1, Doc. 5.) No

indications exist that Torres has had any documented interactions with immigration enforcement officers during his time in the United States. (*See generally* Doc. 1, Doc. 5.) The Government confirmed that it has no evidence of any such encounters at the hearing on July 7, 2026. The Government additionally confirmed that Torres lacks any identified criminal record.

ICE agents in an unmarked truck pulled Torres over while he was driving at approximately 7:00 a.m. in Bozeman, Montana, on June 29, 2026. (Doc. 1 at 8.) Torres was stopped at a stoplight when the unmarked truck activated its light bar to indicate to Torres to pull over. (*Id.*) Torres immediately pulled over. (*Id.* at 9.) The unmarked truck parked behind Torres and an ICE agent approached Torres, and asked Torres for his license which Torres provided. (*Id.*) A second ICE agent approached Torres's passenger side window. (*Id.*) The first agent asked Torres to roll down his passenger window. (*Id.*)

No Montana Highway Patrol officer, Gallatin County Sheriff's officer, or officer from any Montana law enforcement agency with authority to conduct traffic stops appeared to be present. (*Id.*) The ICE agents told Torres that he had no right to be in the United States based on the information the ICE agents had obtained from Torres's driver's license. (*Id.*) The first ICE agent reached over Torres's open car window, unlocked Torres's vehicle from the inside, and forcibly removed Torres from his vehicle. (*Id.*) Torres had provided no indication of resistance at any point.

(*Id.*) The ICE agents immediately handcuffed Torres and placed him in their truck. (*Id.*)

The ICE agents already had arrested another individual and placed them in the back of the truck as well. (*Id.* at 10.) The ICE agents then drove to a second location, a plaza in Bozeman, and removed Torres from the truck. (*Id.*) The ICE agents handcuffed Torres's hands and feet, waist-shackled him, and placed him into a second van with several other arrested-individuals. (*Id.*) Torres overhead one ICE agent tell another ICE agent that ICE had tased one of the arrested individuals three times. (*Id.*)

ICE detained Torres at the plaza, which appeared to be a staging area for ICE to arrest, detain, and transport individuals, for approximately two hours. (*Id.*) ICE then transported Torres and other arrested individuals to the ICE Helena Hold Room and the Helena Regional Airport in Helena, Montana. (*Id.*) Torres and the other individuals arrived at the Helena Hold Room at approximately 11:00 a.m. (*Id.*) The Helena Hold Room is approximately 10 feet long by 20 feet wide. (*Id.* at 11.) The Helena Hold Room had no beds, a couple of wooden benches, and only one blanket. (*Id.* at 12.) Torress shared the Helena Hold Room with approximately 17 other people. (*Id.*) Torres was forced to stand for over six hours straight due to the cramped nature of the room. (*Id.*)

ICE removed each arrested individual one-by-one and interrogated them. (*Id.*) ICE agents told Torres during his first interrogation that he was going to be locked up for months and that he should voluntarily agree to self-deport. (*Id.*) ICE agents attempted to coerce Torres to self-deport. (*Id.*) ICE agents told Torres that he had no chance of remaining in the United States and voluntary deportation represented his only option. (*Id.*) ICE agents claimed that Torres would receive $270 to voluntarily self-deport. (*Id.*)

ICE agents removed Torres from the Hold Room again in the evening. (*Id.* at 13.) ICE agents presented papers to Torres to again coerce his agreement to self-deport. (*Id.*) Torres believes that the second interrogation occurred sometime between 8:30 p.m. and 11:30 p.m. (*Id.*) Torres declined signing an agreement to voluntarily self-deport. (*Id.*)

ICE agents fingerprinted Torres and returned him to the Helena Hold Room where he spent the night with the other arrested individuals. (*Id.*) ICE permitted Torres to make a six-minute phone call while in the Helena Hold Room. (*Id.*) ICE agents initially refused to allow Torres's legal counsel to speak with him. (*Id.*) ICE agents permitted Torres a three-minute call with legal counsel after nine hours in the Helena Hold Room. (*Id.*) Torres believes that some of the arrested individuals were coerced into signing voluntary self-deportation agreements and were thereafter taken to a different location. (*Id.* at 14.)

ICE agents removed Torres from the Helena Hold Room over 24 hours after he arrived. (*Id.*) ICE agents handcuffed, waist-shackled, and foot-shackled Torres and placed him in another van. (*Id.*) ICE agents drove Torres and other arrested individuals to Cascade County Detention Center ("CCDC"). (*Id.*) Torres was forced to strip naked upon arriving at CCDC. (*Id.*) Torres has not received a custody redetermination hearing before an Immigration Judge ("IJ") since ICE took custody of him. (*See generally* Doc. 1.) The Government argues that Torres is not entitled to a custody redetermination hearing before an IJ as the Government has determined that Torres is subject to mandatory detention under 8 U.S.C. § 1225(b)(2). (*See* Doc. 5.)

The Government acknowledges that the Court recently addressed this issue in *Orozco-Ramirez v. Visser*, __ F. Supp. 3d __, 2026 WL 1329806, at *1 (D. Mont. 2026). (Doc. 5 at 2.) The Government recognizes that the Court declined to adopt the Government's position and instead concluded that the petitioner in that case, Orozco, was not properly subject to mandatory detention under § 1225(b). (Doc. 5 at 2-3, citing *Orozco-Ramirez*, 2026 WL 1329806, at *22.) The Government concedes that "those issues presented in [ ]Torres's petition are for all practical purposes indistinguishable from that presented in *Orozco-Ramirez*." (*Id.* at 3.)

Torres has filed a petition for writ of habeas corpus under 28 U.S.C. § 2241 alleging that he is in custody at the Cascade County Detention Center in violation of

the Constitution or laws of the United States. (Doc. 1.) The Court ordered the Government to respond to Torres's petition. (Doc. 3.) The Court entered an expedited scheduling order to address Torres's petition. (*Id.*) The Government opposes Torres's petition. (Doc. 5.) The Court held a hearing on the matter on July 7, 2026. (Doc. 9.)

## LEGAL STANDARD

"Writs of habeas corpus may be granted by . . . the district courts . . . within their respective jurisdictions." 28 U.S.C. § 2241(a). A habeas petitioner must prove by the preponderance of the evidence that he is "in custody in violation of the Constitution or laws or treaties of the United States." *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004); 28 U.S.C. § 2241(c).

## DISCUSSION

This case concerns the scope of the Government's authority to detain a noncitizen pending their removal proceedings without the opportunity for release on bond under 8 U.S.C. § 1225(b)(2)(A). The Government recently has asserted that all noncitizens who entered the United States without inspection and are later apprehended inside the country must be detained without a bond hearing during their removal proceedings, regardless of how long they have resided in the United States or whether they have a criminal history. The Government specifically has taken the position that such noncitizens remain "applicants for admission" and "seeking

admission," and thus, remain subject to mandatory detention throughout their removal proceedings under § 1225(b)(2)(A) rather than discretionary detention under 8 U.S.C. § 1226(a). The Board of Immigration Appeals ("BIA") adopted this new interpretation of the statute in a precedential decision issued on September 5, 2025. *See Matter of Hurtado*, 29 I. & N. Dec. 216, 220 (B.I.A. 2025).

Courts in many other districts already have addressed a litany of these cases with nearly identical challenges and arguments. The District of Montana first addressed this issue in *Orozco-Ramirez v. Visser*, __ F. Supp. 3d __, 2026 WL 1329806 (D. Mont. 2026). The Government concedes that the issues presented in this case prove nearly identical to those addressed by the Court in *Orozco-Ramirez*. (Doc. 5 at 3.) The Court agrees. The Court will refrain from repeating the bulk of its analysis and will instead provide a brief overview.

The Court declines to address the issue of subject matter jurisdiction as the Government does not raise those arguments in its response. (Doc. 5 at 3 n.2.) The Court notes, however, that it previously determined that it properly can exercise subject matter jurisdiction over these matters as neither 8 U.S.C. § 1252(g) and 8 U.S.C. § 1252(b)(9) bar the Court's subject matter jurisdiction. *Orozco-Ramirez*, 2026 WL 1329806, at *3. The Court will address the remaining issues in turn.

## I. Statutory Classification

The Immigration and Nationality Act of 1952 ("INA"), codified in Chapter 12 of Title 8 of the United States Code, governs all aspects of immigration law. *See* 8 U.S.C. §§ 1101 *et seq*. Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") in 1996, which "substantially amended" portions of the INA's judicial review scheme with a "new (and significantly more restrictive) one." *Nken v. Holder*, 556 U.S. 418, 424 (2009). Along with its changes to the availability of judicial review, IIRIRA added § 1225 to the INA. Section 1225 outlines expedited removal of a certain class of noncitizens. *See Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 109 (2020); *see also Biden v. Texas*, 597 U.S. 785, 804 (2022).

The predecessor to the current language of § 1226 existed in the original INA. *See* INA of 1952, Pub. L. No. 414 (66 Stat. 200) (current version at 8 U.S.C. § 1226). The IIRIRA also enacted the detention provisions at § 1226(a) and § 1225(b)(2). Congress recently amended portions of § 1226 through the passage of the Laken Riley Act. Pub. L. No. 119-1, January 29, 2025, 139 Stat. 3 (2025). The Laken Riley Act amended § 1226 by excluding from § 1226's "permissive detention scheme noncitizens who are inadmissible under § 1182(a)(6)(A), (6)(C), or (7), or are charged with certain [enumerated] crimes." *Lopez-Campos v. Raycraft*, No. 25-

1965, 2026 WL 1283891, at *2 (6th Cir. May 11, 2026) (citing 8 U.S.C. § 1226(c)(1)(E)(i)-(ii); Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025)).

Sections 1225 and §1226 govern how the executive branch evaluates inadmissible noncitizens. The U.S. Supreme Court in *Jennings* has differentiated these two sections, distinguishing their application by the category of noncitizens to which their provisions apply. *See Jennings v. Rodriguez*, 583 U.S. 281, 293 (2018). *Jennings* held that the Government may "detain certain [noncitizens] seeking admission into the country" under § 1225(b) while § 1226 "authorizes the Government to detain certain [noncitizens] *already in the country* pending the outcome of removal proceedings." *Id.* (emphasis added). The statutory language of § 1225 details the process by which immigration officers inspect noncitizens arriving in the United States, refer them for hearings, and initiate procedures for expedited removal. Section 1226 describes, by contrast, how noncitizens may be apprehended and detained. The fact that noncitizens detained under § 1226(a) are entitled to receive bond hearings at the outset of detention represents another distinction between these two sections. 8 C.F.R. §§ 236.1(d)(1); *see also Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1202 (9th Cir. 2022) (observing that § 1226(a) and its implementing regulations "provide extensive procedural protections that are unavailable under other detention provision").

The Government's original interpretation of the IIRIRA, and associated regulations, determined that people who entered the country without inspection were not considered detained under § 1225 and instead were considered detained under § 1226(a). This distinction rendered those persons detained under § 1226(a) eligible for a bond hearing. *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg.10312, 10323 (Mar. 6, 1997) ("Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination"). The Government proceeded for an "unbroken 29-year streak" to provide bond hearings before an IJ for most people who fell into the category of those who were present but entered without inspection and who were not otherwise ineligible for bond. *Lopez-Campos*, 2026 WL 1283891, at *6. The Government's "almost three decades of practice 'is powerful evidence that interpretating [§ 1225(b)(2)(A)] in [this] way is natural and reasonable.'" *Lopez-Campos*, 2026 WL 1283891, at *6 (citing *Abramski v. United States*, 573 U.S. 169, 203 (2014) (Scalia, J., dissenting)).

ICE and the DOJ issued a new policy on July 8, 2025, entitled "Interim Guidance Regarding Detention Authority for Applicants for Admission." *See* ICE Memo: Interim Guidance Regarding Detention Authority for Applications for

Admission, AILA Doc. No. 25071607 (July 8, 2025), https://perma.cc/5GKM-JYGX. This new policy states that all persons who entered the United States without inspection shall now be deemed subject to mandatory detention under § 1225(b)(2)(A). *Id.* The Bureau of Immigration Appeals ("BIA") issued a precedential decision, on September 5, 2025, in *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025), adopting ICE's and DOJ's new policy. Torres, like Orozco, challenges the application of this new policy to his case and argues that he properly should be classified under § 1226(a), rather than § 1225, as he is a person already in the United States. (Doc. 1 at 22.)

Many courts already have addressed challenges to ICE's new policy classifying people in Torres's and Orozco's situation as falling under § 1225 rather than § 1226(a). *See e.g.*, *Bautista v. Santacruz*, 813 F. Supp. 3d 1084, 1097 (C.D. Cal. 2025), *judgment entered sub nom. Maldonado Bautista v. Noem*, No. 5:25-CV-01873-SSS-BFM, 2025 WL 3678485 (C.D. Cal. Dec. 18, 2025) [hereinafter "*Maldonado Bautista*"]. The Central District of California certified a nationwide class for these bond eligible people and extended declaratory judgment to the certified class. *Id*. The Ninth Circuit granted a partial stay of the various *Maldonado Bautista* orders on March 31, 2026, insofar as they extend beyond the Central District of California. *Maldonado Bautista v. U.S. Dep't of Homeland Security*, No. 26-1044 (9th Cir. Mar. 31, 2026). The underlying statutory arguments in *Maldonado*

*Bautista* remain pending before the Ninth Circuit and the declaratory judgment remains in effect within the Central District of California.

The Court found persuasive the analysis and conclusion contained both in *Maldonado Bautista* and in the many cases that have reached the same result. *See Orozco-Ramirez*, 2026 WL 1329806, at *6 (citing *Ramirez*, 2026 WL 310090, at *1 n.2 (noting a news article from January 1, 2026, that found that "more than 300 federal judges in over 1,600 cases across the country have rejected the government's new detention policy, with over 100 new lawsuits filed daily, while 14 federal judges have found in favor of the government's position"); *see also Barco Mercado v. Francis*, 811 F. Supp. 3d 487, 494 (S.D.N.Y. 2025) (discussing the statistics and stated that "the overwhelming, lopsided majority have held that the law still means what it always has meant.")).

The Second, Sixth, Seventh, Eleventh, and recently, the Tenth Circuits, have all reached the same result that people already in the country, like Orozco and Torres, properly are subject to § 1226 rather than § 1225. *See Barbosa da Cunha v. Freden*, __F.4th __, 2026 WL 1146044 (2d Cir. 2026); *Lopez-Campos*, 2026 WL 1283891; *Castañon-Nava v. U.S. Dep't of Homeland Sec.*, __ F.4th __, 2026 WL 1223250 (7th Cir. 2026); *Hernandez Alvarez v. Warden, Fed. Det. Ctr. Miami*, __F.4th __, 2026 WL 1243395 (11th Cir. 2026); and *Santillan Quiroz v. Mullin*, __ F.4th__, 2026 WL 1876709 (10th Cir. June 30, 2026). The Court recognizes that many courts have

concluded otherwise and reached the opposite result. *See e.g.*, *Avila v. Bondi*, 170 F.4th 1128 (8th Cir. 2026); *Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026). The Court remains unpersuaded by the legal analysis in those cases.

The Court reiterates that that the Government's argument proves erroneous for several reasons. *See Orozco-Ramirez*, 2026 WL 1329806, at *6. The Court concludes that the Government's first assertion concerning the plain language of § 1225(b)(2)(A) too narrowly construes the statute. The language an "applicant for admission" cannot be read in a vacuum without considering the partner phrase, "seeking admission." *Id.* at *7. The Government's interpretation would "render superfluous one of the phrases" and violate the canon against surplusage. *Id.* (citing *Lopez-Campos*, 2026 WL 1283891, at *4 (internal citations omitted)). The Court also emphasizes that Tenth Circuit's conclusion that the language does not indicate what the Government argues. *See Santillan Quiroz*, 2026 WL 1876709, at *7 ("The upshot is that once a noncitizen has entered unlawfully, no amount of legal maneuvering allows him to go back in time and make his initial entry lawful. The only time a noncitizen can be said to be seeking admission is when he is seeking to enter the United States at the border.").

The Court in *Orozco-Ramirez* further concluded that the statutory structure of the INA and specifically, the heading under which § 1225(a)(1) falls, further supported these conclusions. *Orozco-Ramirez*, 2026 WL 1329806, at *7. The Court

reasoned that the Government's interpretation of the § 1225 would "effectively remove[] § 1226 from existence." *Id.*, (quoting *Maldonado Bautista*, 813 F. Supp. 3d at 1105).

The Court further concluded that the plain language of § 1226 also clearly demonstrates that Congress intended it to apply to noncitizens like Orozco, and now Torres. *Orozco-Ramirez*, 2026 WL 1329806, at *7. Section 1226(a) authorizes that "on a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). "Except as provided in subsection (c)," when a noncitizen is arrested under section 1226(a), the Attorney General may detain him or release him on bond or conditional parole. 8 U.S.C. § 1226(a)(1)-(2).

This process includes the right to a bond hearing before an immigration judge. *See* 8 C.F.R. § 1236.1(d). At that hearing, the noncitizen may present evidence of their ties to the United States, lack of criminal history, and other factors that show they do not present a flight risk or danger to the community. *See generally In Re Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006); *see also Martinez v. Clark*, 124 F.4th 775, 783 (9th Cir. 2024) (discussing *Guerra* factors). Section 1226(c) then "carves out a statutory category of aliens who may *not* be released under § 1226(a)." *Jennings*, 583 U.S. at 289 (emphasis in original). Torres, like Orozco, does not fall into any of these non-releasable categories.

The Court determined that "[a] plain reading of this exception implies that the default discretionary bond procedures in section 1226(a) apply to noncitizens who, like [Orozco and now Torres], are 'present in the United States without being admitted or paroled' under section 1182(a)(6)(A) but *have not been* implicated in any crimes as set forth in section 1226(c)." *Orozco-Ramirez*, 2026 WL 1329806, at *8 (quoting *Rodriguez v. Bostock*, 802 F. Supp. 3d 1297, 1323 (W.D. Wash. 2025) (citing § 1226(a) (Attorney General may release noncitizen on bond "except as provided in subsection (c)")).

The Court again finds that § 1226(a) provides the appropriate governing authority over Torres's detention as the plain language of § 1225 and § 1226, the statutory structure of the INA, longstanding agency practice, congressional intent, and a significant and growing body of case law support his interpretation of the INA. *See Orozco-Ramirez*, 2026 WL 1329806, at *8. The Court declines to credit the Government's repeated position that Torres is "seeking admission" to the United States, or is an "applicant for admission," and thus should be subject to mandatory detention under § 1225(b). The Court remains unpersuaded by the authorities on which the Government relies. The Court instead finds that Torres may be subject to detention only as a matter of discretion under § 1226(a) and that Torres remains eligible for a bond hearing.

## II. Due Process

The Fifth Amendment's Due Process Clause prevents the government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amend. V. The Court concluded in *Orozco-Ramirez* that the Government's detention of Orozco violated due process. *Orozco-Ramirez*, 2026 WL 1329806, at *8-10. The Government provides no new arguments on the subject. (Doc. 5.)

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). It proves well established that such protection extends to noncitizens, including those persons involved in removal proceedings. *See id.* at 693. As noted by *Zadvydas*, "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."). *Id.*; *See also Reno v. Flores*, 507 U.S. 292, 306 (1993). "Even noncitizens have a liberty interest in continued freedom from civil immigration confinement." *Valdez v. Joyce*, No. 25 Civ. 4627, 2025 WL 1707737, at *2 (S.D.N.Y. June 18, 2025) (citing *Lopez v. Sessions*, No. 18 Civ. 4189, 2018 WL 2932726, at *12 (S.D.N.Y. June 12, 2018) ("Petitioner's re-detention, without prior notice, a showing of changed circumstances, or a meaningful opportunity to respond, does not satisfy the procedural requirements of the Fifth Amendment.")).

Noncitizen detainees charged with being in the U.S. illegally remain entitled to procedural due process, meaning "notice and opportunity to be heard appropriate to the nature of the case." *Trump v. J. G. G.*, 604 U.S. 670, 673 (2025) (internal quotation marks omitted); *see also A. A. R. P. v. Trump*, 605 U.S. 91 (2025). "'Procedural due process rules are meant to protect' against 'the mistaken or unjustified deprivation of life, liberty, or property.'" *A. A. R. P.*, 605 U.S. at 94 (quoting *Carey v. Piphus*, 435 U.S. 247, 259 (1978)). Due process "is a flexible concept that varies with the particular situation." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). "[T]he government's discretion to incarcerate non-citizens is always constrained by the requirements of due process." *Hernandez v. Sessions*, 872 F.3d 976, 981 (9th Cir. 2017).

Substantive due process protects individuals from government action that interferes with fundamental rights. *See Regino v. Staley*, 133 F.4th 951, 959-60 (9th Cir. 2025). "Governmental action that infringes a fundamental right is constitutional only if 'the infringement is narrowly tailored to serve a compelling state interest.'" *Id*. at 960 (citing *Reno*, 507 U.S. at 302). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty [the Due Process Clause] protects." *Zadvydas*, 533 U.S. at 690.

Substantive due process thus protects noncitizens from arbitrary confinement by the government. Immigration detention represents civil detention, and civil

detention violates a noncitizen's substantive due process rights except in certain "special and narrow nonpunitive circumstances where a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Id*. at 690 (internal quotations omitted) (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992); *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997)). The Court already has determined that § 1226 applied under similar circumstances in *Orozco-Ramirez*. *See Orozco-Ramirez*, 2026 WL 1329806, at *8. It proves worth noting, however, that the Ninth Circuit previously has questioned the constitutionality of prolonged detentions under § 1225(b). *See Rodriguez v. Marin*, 909 F.3d 252, 256–57 (9th Cir. 2018).

Courts apply the three-part test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), to determine whether detention violates procedural due process. *See Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1203-07 (9th Cir. 2022) (collecting cases and applying the *Mathews* test in a similar immigration detention context and holding that "[u]ltimately, *Mathews* remains a flexible test that can and must account for the heightened governmental interest in the immigration detention context"). Courts weigh the following three factors under *Matthews*: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest,

including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

The Court addressed each *Matthews* factor in *Orozco-Ramirez*. *Orozco-Ramirez*, 2026 WL 1329806, at *9-10. The Court concluded that the first *Matthews* factor weighed heavily in favor of Orozco as his private interest in being free from imprisonment proved "the most elemental of liberty interests." *Id*., at 9 (quoting *Hamdi*, 542 U.S. at 529). The Court further reasoned that no final order of removal, or the availability of any existing process to challenge the Government's decision to detain a petitioner without bond, diminished the petitioner's liberty interests. *Orozco-Ramirez*, 2026 WL 1329806, at *9 (citing *Rodriguez Diaz*, 53 F.4th at 1208 (holding that the habeas petitioner's liberty interest had been diminished by the fact that he was subject to a final order of removal, already had been afforded an individualized bond hearing, and had additional process available to him through a further bonding hearing before an IJ upon a showing of materially changed circumstances)).

The Court concluded that the second *Matthews* factor also weighed heavily in favor of granting Orozco procedural protections under § 1226(a). *Orozco-Ramirez*, 2026 WL 1329806, at *10. The Court concluded that "[t]he risk of erroneous deprivation is extraordinarily high where ICE and [Department of Homeland

Security] [“]DHS[“] agency officials have sole, unguided, and unreviewable discretion to detain [people like Orozco, and now Torres] without any individualized showing of why this detention is warranted, nor any process for [those noncitizens] to challenge the exercise of that discretion.” *Id.*, at *9 (quoting *Jacobo Ramirez v. Noem*, 817 F. Supp. 3d 1037, 1055 (D. Nev. 2025)). Torres, like Orozco, faces no criminal charges and has no prior convictions. Torres, like Orozco, has family and community ties in the country, and specifically in Bozeman, Montana. The Government has not asserted that Torres presents a danger to the community or a flight risk. The combination of these factors again demonstrates that the Government likely has been arbitrarily and unjustifiably depriving Torres of his liberty. *See Orozco-Ramirez*, 2026 WL 1329806, at *9; *see also Jacobs Ramirez*, 817 F. Supp. 3d at 1055.

The additional procedures in this case simply would be a recognition of, and respect for, existing procedures available under § 1226(a), including an individualized custody redetermination by an immigration judge, in other words, a bond hearing. Application of these procedures may mitigate the risk of erroneous deprivation of Torres’s liberty. These procedures would require the Government to establish that Torres presents a flight risk or danger to the community to continue his detention for the pendency of removal proceedings. These procedures attempt to enforce the constitutional requirement that “once the flight risk justification

evaporates, the only special circumstance [] present is the alien's removable status itself, which bears no relation to a detainee's dangerousness." *Zadvydas*, 533 U.S. at 691-92.

The Court determined that "[t]he Government holds no interest in the unjustified deprivation of a person's liberty," and, therefore, the third and final *Mathews* factor weighed in favor of Orozco. *Orozco-Ramirez*, 2026 WL 1329806, at *10. The Court also found that limiting the use of detention to only those noncitizens who are dangerous or a flight risk through existing bond procedures serves the government's and public's interest by *reducing* the fiscal and administrative burdens attendant to immigration detention. *Id.*, (citing *Hernandez*, 872 F.3d at 996 (noting individual costs of immigration detention in 2017)). The Court again concludes that the *Mathews* factors weigh heavily in favor of Torres. Torres's detention without the opportunity for release on bond violates his procedural due process rights.

The Court further concludes that the Torres's detention also violates substantive due process as it did in *Orozco-Ramirez*. *Orozco-Ramirez*, 2026 WL 1329806, at *10. The Government has again asserted no individualized justification—let alone a special or compelling justification—to continue to deprive Torres of his physical liberty. Such indifference from the executive branch to the Constitution's guarantee of freedom from arbitrary confinement presents grave

cause for concern. Accordingly, this Court further finds that the Government likely has detained Torres in violation of both his substantive and procedural due process rights.

**III. Remedy**

Torres asks the Court either to order the Government to release him immediately or promptly schedule and conduct a bond hearing. (Doc. 1 at 28.) The Government argues that the Court lacks jurisdiction to conduct a bond hearing. (Doc. 5 at 14.) The Court recognizes the specific harm suffered by Torres in the form of detention with no opportunity for a bond hearing and no initial predetermination that detention proved necessary. This specific harm should be remedied by ordering Torres's immediate release, subject to appropriate bond conditions, and enjoining the Government from preventing his release on the basis that he is detained under § 1225(b)(2).

Injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 680 (9th Cir. 2021) (cleaned up). "Where relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown[.]" *Id.* (citation omitted). The federal habeas corpus statute "does not limit the relief that may be granted to discharge of the applicant from physical custody." *Carafas*, 391 U.S. at 238. "Its mandate is broad

with respect to the relief that may be granted." *Id*. "It provides that '[t]he court shall . . . dispose of the matter as law and justice require.'" *Id*. (quoting 28 U.S.C. § 2243).

Any post-deprivation review by an immigration judge would prove inadequate given the nature of the constitutional violation Torres sustained here that involved the Government's failure to conduct any kind of individualized assessment *before* detaining Torres. "The [Government] had ample opportunity to argue that [Torres] is or would be subject to detention under § 1226, but [it] failed to do so. Without any lawful basis for his detention at this time, the Court can only find that [Torres] is entitled to immediate release." *Lara-Reyes v. Woodall*, No. 3:25-CV-1618-MMH-PDB, 2026 WL 733712, at *6 (M.D. Fla. Mar. 16, 2026). The Court is further concerned that an immigration judge may refuse to conduct a bond hearing based on *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216, 220 (BIA 2025).

The Court emphasizes that "a subsequent 'bond determination by a DHS officer or an immigration judge would not remedy the core constitutional violation at issue[.]'" *Rafael Alvarez Suarez, et al., Petitioner, v. Darin Balaam, et al., Respondents. Additional Party Names: Chinchilla-Ruano, Garcia Espinoza, Ibarra-Valdez, Manuel Vargas, Morataya, Singh*, No. 2:26-CV-01366-RFB-NJK, 2026 WL 1907197, at *8 (D. Nev. July 2, 2026) (quoting *Rodriguez-Acurio v. Almodovar*, 811 F. Supp. 3d 274, 319–20 (E.D.N.Y. 2025)). The Court agrees with other courts in concluding that "[i]mmediate release is thus the appropriate remedy for Federal

Respondents' 'detain first, justify later' approach to Petitioners' liberty, which mangles § 1226(a)'s regulatory framework and due process." *Rafael Alvarez Suarez, et al.*, 2026 WL 1907197, at *8.

"Ordering a bond hearing here 'would effectively allow the Government to transform an unlawful detention into a lawful one through *post-hoc* justifications' and would inadequately remedy the harms [Torres] ha[s] suffered." *Id.*, at *10 (quoting Zheng v. Rokosky, __F. Supp. 3d. __, No. 26-CV-01689, 2026 WL 800203, at *11 (D.N.J. Mar. 23, 2026)); *see also, e.g.*, *E.A. T.-B. v. Wamsley*, 795 F. Supp. 3d 1316, 1324 (W.D. Wash. 2025) ("Although the Government notes that Petitioner may request a bond hearing while detained, such a post-deprivation hearing cannot serve as an adequate procedural safeguard because it is after the fact and cannot prevent an erroneous deprivation of liberty."); *Domingo v. Kaiser*, No. 25-CV-05893 (RFL), 2025 WL 1940179, at *3 (N.D. Cal. July 14, 2025) ("Even if Petitioner[ ] received a prompt post-detention bond hearing under 8 U.S.C. § 1226(a) and was released at that point, he will have already suffered the harm that is the subject of his motion: that is, his potentially erroneous detention.") (citation omitted).

The Court orders Torres's immediate release. The record presented to the Court demonstrates that Torres has important ties to the community of Bozeman, Montana, particularly through his role as the primary caretaker of his grandmother

who is undergoing chemotherapy treatment for cancer. Torres has no criminal record. The record further establishes that Torres presents no flight risk or danger to the community. Torres's continued detention violates his constitutional rights.

The Court further finds it appropriate to require that, in the event DHS seeks Torres's re-detention under § 1226(a), the Government "must provide [him] with *a pre-deprivation* bond hearing before an IJ, wherein the government must prove, by clear and convincing evidence, that detention is appropriate." process." *Rafael Alvarez Suarez, et al.*, 2026 WL 1907197, at *10 (citing *Martinez v. Clark*, 124 F.4th 775, 784 (9th Cir. 2024) (reviewing the immigration court and BIA's compliance with a district court's conditional writ ordering a bond hearing "under the Due Process Clause" wherein the government was required "to show by clear and convincing evidence that the detainee presents a flight risk or a danger to the community at the time of the bond hearing" to continue the petitioner's detention) (citing *Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011))). The Court, like the District of Nevada, does not take this step lightly. The Court finds it necessary, however, because of the Government's continued violations of law and Torres's rights to date.

The Court defers on ruling on the matter of attorneys' fees and costs. Should Torres's counsel wish to pursue a claim for attorneys' fees and costs under the Equal

Access to Justice Act (EAJA), they are instructed to file a separate motion on the issue in accordance with Local Rules.

**ORDER**

Accordingly, **IT IS ORDERED**:

- Torres's Petition (Doc. 1) is **GRANTED.**
- The Court orders the Government to release Torres from custody within 24 hours of this Order, under appropriate conditions of release, and to facilitate his transportation from the detention facility by notifying his counsel when and where he can be collected.
- **IT IS FURTHER ORDERED** that the Government must return Torres's personal property, including any personal identification and employment authorization documents, upon his release**.**
- **IT IS FURTHER ORDERED** that the Government is **PERMANENTLY ENJOINED** from detaining Torres pursuant to 8 U.S.C. § 1225(b)(2)(A).
- The Court orders the Government to certify compliance with this Order by filing on the docket.
- The Court retains jurisdiction to enforce its order and judgment. Torres may move to reopen this case to enforce the judgment without filing a separate case.

**DATED** this 7th day of July, 2026.

Brian Morris, Chief District Judge
United States District Court